## IN RE DESTINY R.*
## (AC 33842)

Lavine, Alvord and Flynn, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 31—officially released March 21, 2012**

*Dana M. Hrelic,* with whom were *Brendon P. Levesque,* and, on the brief, *Michael S. Taylor* and *Michael D. Perez,* for the appellant (respondent father).

** March 21, 2012, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Susan T. Pearlman,* assistant attorney general, with whom was *Benjamin Zivyon,* assistant attorney general, and, on the brief, *George Jepsen,* attorney general, for the appellee (petitioner).

*Alina Bricklin-Goldstein,* for the minor child.

*Opinion*

LAVINE, J. General Statutes § 17a-112 (j) (3) (B) (i) provides for the termination of parental rights when the child "has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." The specific steps *facilitate,* but do not guarantee, the return of the child to the parent. See *In re Vincent D.,* 65 Conn. App. 658, 670, 783 A.2d 534 (2001) (successful completion of expectations not sufficient to defeat claim that parent has not achieved sufficient rehabilitation). Although a parent may have participated in the programs recommended pursuant to the specific steps ordered, a court may properly find that the parent has failed to achieve rehabilitation. See *In re Coby C.,* 107 Conn. App. 395, 406, 945 A.2d 529 (2008) (rejecting claim that substantial compliance with specific steps bars court from terminating parental rights). In other words, a finding of rehabilitation is not based on a mechanistic tabulation of whether a parent has undertaken specific steps ordered. The ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time.

See *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

In this matter, the respondent father appeals from the judgment of the trial court, *Hon. William L. Wollenberg*, judge trial referee, terminating his parental rights with respect to Destiny R. (child), pursuant to § 17a-112 (j) (3) (B) (i).[1] On appeal, the respondent claims that the evidence fails to support the court's finding that he failed to achieve such a degree of rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in the child's life. Specifically, the respondent claims that the record does not support what he claims to be the three bases of the court's decision, i.e., that he (1) has not complied with the steps to facilitate reunification, (2) remains involved in the criminal justice system and (3) has been reluctant to comply with programs offered. We disagree and therefore affirm the judgment of the trial court.[2]

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we

---

[1] The court terminated the parental rights of the child's mother as well, but she is not a party to this appeal.

[2] Counsel for the child adopted the brief of the petitioner, the commissioner of children and families, which urged that the judgment of the trial court be affirmed.

retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003).

Following a consolidated trial,[3] Judge Wollenberg made the following findings regarding the facts and procedural history, which he found by clear and convincing evidence. See *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008). When the child was born on April 26, 2008, a hospital nurse reported to the department of children and families (department) that the mother tested positive for marijuana on that date as well as on March 6, March 27, and April 9, 2008, and for marijuana and cocaine on March 21, 2008. The child's mother admitted that she had smoked marijuana throughout her pregnancy because it helped to increase her appetite and to elevate her depressive feelings. Department personnel took the child into protective custody soon thereafter and placed her with a licensed foster family. Judge Wollenberg granted the motion for

[3] The court, *Keller, J.*, ordered a consolidated trial on the maternal grandmother's motion to transfer guardianship, the respondent's motion to modify disposition and the petitions to terminate the parental rights of the respondent and the child's mother.

order of temporary custody,[4] which was sustained by the court, *Keller, J.*, on May 9, 2008. Judge Keller ordered specific steps for the respondent.[5]

[4] The motion for order of temporary custody, which was admitted into evidence at the termination of parental rights hearing, alleged that the child was in immediate physical danger from her surroundings and continuing to live in the home was contrary to the child's welfare. Attached to the motion for order was an affidavit from department social worker, LaDonn Barros, setting forth the results of her investigation.

Barros attested that the child's mother had been in a relationship with the respondent for approximately one year. The mother had a history of substance abuse that predated and continued during her pregnancy with the child. The mother has older children who had been removed from her custody. The mother was attempting to find stable housing so that her older children could be returned to her. She had been involved with a man who abused her.

The respondent reported that he had been involved with the mother for approximately one year, but that they were not currently together. He is older than the mother and felt like he was her parent. He and the mother argue. The respondent admitted to having grabbed and shaken the mother. He also reported that he has three older children by other women. During his life, the respondent has been involved in many fights and has been incarcerated. When he was a child, he was diagnosed with attention deficit hyperactivity disorder and prescribed Ritalin. He stopped taking the medicine when he turned eighteen and did not feel that he needed it. Barros observed that the respondent was in a constant state of motion and the respondent presently feels he needs the medication.

Barros found infant supplies in the respondent's one bedroom apartment, which was neat, but only partially furnished. Barros observed two large knives in the respondent's bedroom, and the respondent showed her two sword-like knives. The respondent told Barros that he collects knives. Barros' investigation revealed that the respondent was involved in a case of domestic violence with the mother of one of his children and that he is a convicted felon.

Barros identified the presenting concerns as the parents' history of domestic violence, the mother's abuse of illegal substances during the pregnancy and the respondent's criminal history and knife collection.

[5] The respondent was ordered to keep all appointments with the department; keep his whereabouts known to the department; participate in parenting and individual counseling to increase his parenting skills, address substance abuse and domestic violence issues; accept and cooperate with in-home support services; submit to substance abuse assessment and random drug testing; cooperate with recommended service providers for parenting, individual and family counseling; cooperate with court-ordered evaluations or testing; sign releases permitting the department to communicate with service providers; secure and maintain adequate housing and legal income; not engage in substance abuse; have no further involvement with the criminal justice system; consistently and timely meet the child's needs; advise the department of changes in the composition of the household; visit the child as often as permitted and provide the department with the names

The petitioner, the commissioner of children and families, filed a neglect petition that alleged the following jurisdictional facts: the mother has a history of substance abuse and tested positive for marijuana at the time of the child's birth and the parents have a history of domestic violence. At the hearing, department personnel reported that the respondent and the child's mother had been evicted from their apartment and that they had failed to provide a forwarding address. On July 29, 2008, the court, *Dannehy*, *J.*, adjudicated the child neglected, committed her to the custody of the petitioner and reaffirmed the specific steps previously ordered for the respondent. See footnote 5 of this opinion.

On December 2, 2008, the respondent and the child's mother were arrested on drug related charges. The respondent was jailed for approximately one month, convicted, and given a suspended sentence and three years of probation.

On January 29, 2009, the petitioner filed a permanency plan to terminate the respondent's parental rights with respect to the child and for adoption, a plan supported by the child's attorney. The respondent did not object to the permanency plan, which was approved following a hearing on March 17, 2009.

The respondent and the child's mother had a second child, LR, on May 8, 2009. At the time, the respondent and the mother were living with the child's maternal grandfather in a one bedroom apartment. The respondent and the child's mother later were able to find an apartment of their own. On May 19, 2009, the petitioner filed a revised permanency plan to reunify the child with her parents, and the child was reunited with them on November 24, 2009.

of any person whom the respondent would like the department to consider as a placement resource for the child.

On December 17, 2009, Judge Dannehy found that cause for the child's commitment no longer existed and ordered six months of protective supervision for her, until June 17, 2010. The court also ordered final steps for the respondent that were in addition to those steps set forth in footnote 5 of this opinion.

The respondent was arrested again on February 25, 2010, and charged with assault in the first degree on the basis of allegations that he had been involved in a serious incident on May 5, 2008. His fingerprints were found on a live bullet found at the scene of the assault. Because he was unable to post bail,[6] the respondent was incarcerated at MacDougall-Walker Correctional Institution. Due to the serious injuries the assault victim sustained, the respondent potentially faced a long sentence. Protective supervision for the child was extended until October 17, 2010, at the request of the child's attorney.

On May 14, 2010, the child's mother tested positive for marijuana, cocaine and amphetamines. During an unannounced visit from a department social worker and a Section 8 housing case manager that occurred on June 7, 2010, the mother admitted to having used marijuana and cocaine three times over the past weekend while the child and LR were in the care of their maternal grandmother. On June 11, 2010, department personnel again sought orders of temporary custody for the child due to the mother's substance abuse relapse and placed the child and LR in the foster home where the child had been placed in 2008. On June 16, 2010, Judge Dannehy reviewed the specific steps ordered for the respondent and added a step for individual counseling. The court also granted a motion filed by the child's attorney for psychological evaluations of the parties.

---

[6] The respondent testified that his bail was set at $500,000 due to his criminal history.

The mother was taken to Amethyst House in New Haven for inpatient substance abuse treatment, but she left without completing the program. The Section 8 case manager closed the mother's file due to her failure to comply with treatment goals. The mother did not tell the department personnel that she had lost her apartment until July 8, 2010. She requested outpatient treatment for substance abuse, but refused to inform department personnel of her whereabouts. The respondent was incarcerated awaiting trial on the assault and robbery charges at the time the mother relapsed and lost their apartment.

On September 1, 2010, the respondent and the child's mother agreed to the order of temporary custody and pleaded nolo contendere in response to the allegation that the child was neglected. The child was recommitted to the custody of the petitioner. The court, *Frazzini, J.*, ordered additional steps for the respondent, specifically parenting and individual counseling.

Later in September, 2010, a jury found the respondent not guilty of the assault charges, and he was released from custody. On September 29, 2010, he filed a motion to modify the disposition of the child from commitment to protective supervision. In his motion, the respondent represented that he had been released from prison, was sharing a one bedroom apartment with the child's maternal grandfather and living apart from the child's mother. He also identified the parenting, educational and training programs he had completed[7] and represented that his toxicology reports were negative for substance abuse.

Judge Keller ordered that a consolidated trial be held to address all pending matters in the case, i.e., the petitions to terminate the parental rights of the child's

[7] The dates the respondent completed those programs predate his incarceration.

parents, the maternal grandmother's motion to transfer guardianship of the child and the respondent's motion for modification. The court granted a motion filed by the child's attorney for interactional evaluations of the child with the respondent and others. Judge Wollenberg conducted the consolidated trial over several days between December 9, 2010, and May 2, 2011. The court issued its memorandum of decision on August 11, 2011.[8]

In addition to the facts previously set out, the court made the following findings as to the respondent himself. The respondent was born on May 11, 1980, in Brooklyn, New York, and moved to Connecticut with his parents in 1992. He claimed to have had a fair relationship with his parents, whom he credits for making him the man that he is. He got his first job when he was eighteen and dropped out of high school when he was in the twelfth grade. The respondent has been employed by Chili's, Wal-Mart and Rainforest Café for varying lengths of time. He also has performed landscaping work for which he was paid "under the table." At the time of trial, the respondent was not employed.

The respondent has a significant criminal history, having been arrested eight times since March, 1999, and convicted of several felonies. He was incarcerated from February, 2000, until April, 2004, for conspiracy to commit robbery in the first degree. He also was convicted of assault in the third degree, robbery in the first degree, carrying a dangerous weapon, larceny in the third degree, possession of narcotics and carrying/selling a weapon. While he was in prison, the respondent received training in the culinary arts. At the time of trial, the respondent was on probation arising from his conviction of the December, 2008 drug related crimes.

---

[8] Judge Wollenberg terminated the parental rights of the respondent and the child's mother for failure to rehabilitate, denied the respondent's motion to modify disposition to protective supervision and denied the maternal grandmother's motion to transfer guardianship.

The respondent has never been married, but he has fathered five children by four different women. His two oldest children, a son and a daughter, were born four months apart in 1999 and 2000. In September, 2004, the respondent was involved in an incident of domestic violence involving the mother of one of those children.[9] A second daughter, his third child, was born in October, 2006. He testified that he had been in a relationship with the mother of the child and LR for two years prior to being incarcerated in February, 2010.[10] The respondent's three oldest children do not live with him, and

[9] In her affidavit, LaDonn Barros, a department social worker, reported this incident as follows: "A report was received 9-6-04 alleging that [the respondent] and another woman were involved in a domestic violence incident in which [the respondent] was stabbed in the hand in the presence of a [two and one-half] year old child. The other woman was arrested. During the investigation, [the respondent] reported that he and this woman were arguing over a girl calling the home for him. According to [the respondent], he grabbed the woman, while she was holding a knife, to get her to listen to him. He stated they were yelling and struggling, they both fell to the floor and he was cut with the knife requiring [seven] stitches. Neglect was substantiated and the child was removed by [ninety-six] hour hold on 9/6/04. The woman involved in this incident is the mother of the father's child [born in 2000]." The child involved in the 2004 incidence of domestic violence was not the respondent's child.

[10] The court also made findings as to the child's mother, which we include here as they are relevant to the respondent's appeal. The mother was born in Puerto Rico and moved to Connecticut with her parents when she was seven years old. She had a good relationship with her parents until she was fourteen, when they separated. Her parents remain married but do not live together.

The mother has had significant relationships with three men, but she has never been married. She had children with two of the men. She was involved with Gilberto R. for five years and became pregnant with his children when she was fourteen and again when she was seventeen. The child's maternal grandmother gained temporary custody of those two children to allow the mother to achieve stability and to find an apartment. See footnote 13 of this opinion. The mother was ordered not to have unsupervised visitation with those children. The mother was involved with Luis C. for approximately two years. She described Luis C. as abusive and jealous. He once beat her so severely that she had to be hospitalized with a broken jaw. Eventually she reported the abuse to the police. Luis C. was incarcerated, but the mother did not receive services to address domestic violence. During the summer of 2010, Luis C. sought to resume his relationship with the mother

he has never paid any child support for any of them. He claims to have a positive relationship with all of his children.

The court found that, at the time of trial, the respondent was on probation for his 2009 conviction on drug charges. He was residing with the child's maternal grandfather, whose motor vehicle he drove. Although he is unemployed, the respondent claims that he purchases things that the child needs. He claims that he and the child's mother are no longer romantically involved, but that they remain friends and she is dependent on him.[11] He provides the mother with emotional support and transportation and makes telephone calls on her behalf. The mother's extended family provides a support system for both of them.[12]

As to the child, the court found that she has thrived in her foster home. Aside from asthma, she has no

and stalked her. The mother became involved with the respondent and had two children with him. The mother claims that she is no longer in a romantic relationship with the respondent, but that he is a support for her. But see footnote 11 of this opinion.

The mother was arrested with the respondent on December 2, 2008, on drug related charges. The charges against the mother were nolled.

[11] Although he claims not to be romantically involved with the child's mother, the respondent admitted that he provides emotional support to the mother and is intimate with her. He testified that in March, 2011, the mother became pregnant with his child. The two of them decided that the mother should have an abortion because they were not in a position to have a child.

[12] During cross-examination, the respondent was questioned as to the formal child care arrangements he had in place if he were to get a job. The respondent testified that he would rely on the maternal grandmother, great grandmother and the uncles for child care. The court then questioned the respondent as follows:

"The Court: Isn't it the grandmother who is asking for—to have a transfer of guardianship, is she included in this?

"[The Respondent]: Yes.

"The Court: So you have no objection to her taking care of the children?

"[The Respondent]: I don't. If the court finds her suitable, my children being with me in the grandfather's house in the one bedroom, then I wouldn't mind the grandmother having custody of the children until I do get my apartment and do what I got to do myself." See footnote 13 of this opinion.

significant health issues. When the child was first placed with her foster family, she attended a licensed day care facility, where she formed healthy relationships with her peers and learned age appropriate skills. When the child was reunified with the respondent and her mother on November 24, 2009, her foster parents, who had reared her for the first nineteen months of her life, offered their continued support. Her foster parents made efforts to communicate with the child's family, but the child's mother told a department social worker that she chose not to engage in regular communication with the foster parents because she was jealous of their relationship with the child.

During the time that the child lived with the respondent and the mother, the child's maternal grandmother cared for her and LR when her parents went out. According to the maternal grandmother, she also watched the children while the mother went "clubbing." After the respondent was arrested in February, 2010, the mother had a difficult time maintaining the household in his absence and relapsed into substance abuse. The petitioner again assumed custody of the child in June, 2010. The child and LR were placed together with the foster family that first cared for the child in June, 2008.

The child's foster parents reported that the child's transition back into their home was difficult. She had nightmares and sleep disruptions. The child also was unable to return to her previous day care provider for a period of time because she did not want to be separated from her foster parents. Although the day care was safe and familiar to her, the child had to return on a part-time basis. Subsequently, she has done well.

The child interacts positively with the respondent and the mother when she visits with them. During some of the earlier visits, the child sought out her foster father for reassurance. Her foster father transports the child

to those visits, as she experiences significant anxiety about getting into a motor vehicle with anyone else. Bruce Freedman, who conducted a court-ordered psychological evaluation of the child on August 24, 2010, described the child as "secure and strongly attached to [the foster parents], and regarded them in every way as mom and dad. Her best interests would be served by having her remain in this home, and by securing the permanence and stability of this home through legal measures." Freedman also found that the child has a significant attachment to LR.

During her life, the child has lived with her biological mother for six and one-half months and the respondent for three months. The court found that she may have developed relationships with her maternal and paternal half-siblings during that time, but she has never resided with them. The child's maternal grandmother provided child care for her during the six and one-half months the child lived with her mother.[13]

---

[13] Judge Wollenberg also made findings regarding relative resources. The child's maternal grandmother filed a motion to intervene in the proceedings in July, 2010, but Judge Dannehy denied the motion with prejudice finding that the motion was not timely filed. Moreover, Judge Dannehy found that the maternal grandmother failed to report the mother's drug usage while the child was under protective supervision. On October 18, 2010, Judge Keller granted the maternal grandmother's motion to intervene in the neglect petitions for LR and the child, but not in the termination proceedings for the child. Judge Keller found the maternal grandmother to be "kind of a Joey-come-lately with respect to [the child's] case" and that the child had a strong relationship with her foster parents. Judge Keller stated "I'm relying on what is the stronger relationship and what is her best interest for permanency. And at this point in time you have a really high hurdle to overcome . . . . And right now, from everything I have heard so far, the foster parents would have priority over her." Judge Keller also found the maternal grandmother to be a poor historian.

At the consolidated trial, Judge Wollenberg found the maternal grandmother's credibility to be dismal. He denied the maternal grandmother's motion to transfer guardianship to her stating that a thorough review of all of the evidence makes clear that the maternal grandmother is not a proper person to be given guardianship of the child. The court found, in part, that the "history of the manner in which [the mother] was parented as a child of fourteen and thereafter . . . gives this court reason for pause and question

Judge Wollenberg found by clear and convincing evidence that grounds to terminate the respondent's parental rights existed at the time the petition was filed on October 24, 2010, and that department personnel had made reasonable efforts to reunify the child with the respondent. The court found that the respondent's continuing disregard for meaningful family relationships gave it "little or no encouragement" that the respondent will ever gain insight or adjust his lifestyle and priorities to those of a responsible parent. The respondent was unwilling or unable to benefit from department efforts because he has failed to show progress in his rehabilitation with regard to mental health, substance abuse, parenting, anger management, domestic violence and involvement in the criminal justice system. Moreover, the respondent was still on probation. The court found that the credible evidence presented in the termination of parental rights social study and exhibits clearly and convincingly established that the respondent had not achieved rehabilitation pursuant to § 17a-112 (j) (3) (B) (i).

The court supported its conclusion that the respondent's parental rights should be terminated by finding

concerning the credibility of events in the lives of the members of this family. . . . [From the time the mother first gave birth in 2001, she] was allowed to engage in a lifestyle with little or no guidance from [the maternal grandmother]. [The mother] was involved in the drug scene, associating with male companions with domestic violence tendencies and living however she wanted. She was not required to attend school, to parent her children, or to grow and mature to adulthood." Moreover, the court found the maternal grandmother claims "she was unaware of the fact that at her birth, [the child] was removed from [the mother]. . . . [The maternal grandmother] claims she was unaware, at least at times, that [the mother] had a substance abuse problem."

The respondent testified as follows when questioned by the court:

"The Court: So at this point, if we finish this trial, and the court makes a decision to give guardianship to maternal grandmother, you have no objection?

"[The Respondent]: I have no objection to that."

that, at the time the child was found neglected, the respondent's presenting problems were unemployment and eviction. He had a significant criminal history and continued to reside with the child's mother while she was abusing substances, even while she was pregnant with the child. Moreover, the respondent failed to comply with the steps to facilitate the child's return, remains involved with the criminal justice system and was reluctant to comply with programs as offered. He has been involved with child protective services since 2004, and the services provided to him have been unsuccessful in mitigating the issues identified by child protective services.

As to the child, the court found that she needs a permanent home where she can continue to flourish and grow and that her preadoptive foster parents are committed to ensuring that she is in a safe, loving and consistent home. At the conclusion of the trial, the child was three years and three months old. She has exhibited a limited bonding with the respondent due to his reluctance to accept his role as a parent. The child has developed a strong bond with her foster parents with whom she has lived since birth, apart from a six month reunification with her parents. The foster parents have expressed a desire to adopt her.

Pursuant to § 17a-112 (j) (2), the court found by clear and convincing evidence that termination of the respondent's parental rights was in the child's best interest. The court balanced the child's intrinsic need for stability and permanency against the benefits of her maintaining a connection with the respondent. The court found that it was not in the child's best interest to maintain a legal relationship with the respondent. His judgment and conduct remain questionable and have not improved since the child was taken into the petitioner's care. The child has a pressing need for permanence and stability. The respondent requires much time to address his issues,

undertake the necessary counseling and succeed in it to establish himself in the community and show that he is capable of being a safe, nurturing and responsible parent in the child's life. The court could not foresee the respondent's having the ability or the opportunity to follow the regimen necessary for the child to maximize her abilities and achievements. The court therefore terminated the respondent's parental rights with respect to the child.

On appeal, the respondent claims that the three bases for the court's finding that he had failed to rehabilitate are not supported by the record. Specifically, he claims that there is no support in the record for the court's finding that he (1) had not complied with steps to facilitate the return of the child to his care, (2) remains involved with the criminal justice system and (3) was reluctant to comply with programs as offered, has been involved with child protective services since 2004 and has been unsuccessful with the help of programs offered in mitigating the issues identified by child protective services. We disagree with the respondent's claims.

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate . . . in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Vincent D.*, supra, 65 Conn. App. 669.

I

The respondent first claims that the court improperly found that he had not complied with the steps to facilitate the return of the child. We disagree.

The issue presented by the respondent's claim is whether he attended and completed the programs to which he was referred. In support of that claim, the respondent points to some discrepancies between the department's social study in support of termination of parental rights petition (report) and the testimony of department personnel. We acknowledge that there are some discrepancies as to whether the respondent participated in and completed certain programs,[14] but those discrepancies do not overcome the uncontested evidence of the steps the respondent failed to take or complete.

A review of the steps ordered by the various trial courts is in order. At the time the child was adjudicated neglected, Judge Keller ordered the respondent to participate in parenting and individual counseling to increase his parenting skills, address substance abuse and domestic violence, submit to substance abuse assessment and random drug testing, secure and maintain adequate housing and legal income, have no further involvement with the criminal justice system and consistently meet the child's needs. See footnote 5 of this opinion. Judge Dannehy ordered additional final steps in December, 2009, including family counseling to increase the respondent's awareness of parenting skills, substance abuse, domestic violence and mental health issues. When department personnel took temporary custody of the child in June, 2010, Judge Dannehy reviewed the specific steps for the respondent and added *individual counseling* with goals for the respondent to "address & gain insight regarding [substance] abuse & criminal involvement & the impact on family &

---

[14] The report indicates that the respondent was not compliant with substance abuse evaluations. The record, including testimony, demonstrates that initially the respondent refused to comply with tests for substance abuse, in particular, hair testing. After the respondent was released from prison in September, 2010, it appears that the respondent was compliant and his tests were negative for substance abuse.

children. Domestic violence: no further family violence and/or to others." On September 1, 2010, when the child was recommitted to the custody of the petitioner, Judge Frazzini ordered further additional steps for the respondent, namely, parenting and individual counseling with goals to "1. Address anger issues to avoid any further incidents of violence, 2. Address & gain insight regarding parental substance abuse & criminal involvement and the impact of these issues on the family & on children." Judge Frazzini ordered the respondent to take advantage of the services offered while he was incarcerated and to submit to substance abuse evaluation and treatment, if recommended.

On the basis of our review of the record, we conclude that the court's finding that the respondent failed to complete the specific steps ordered is not clearly erroneous. There is evidence that the respondent was arrested, convicted of drug charges and placed on probation approximately six months after he was ordered not to have further involvement with the criminal justice system. Although two of the specific steps ordered for the respondent were to find adequate housing and legal income, he has failed to do so.[15]

As noted, the court conducted a consolidated trial that encompassed not only the termination of parental rights petition, but also, the respondent's motion to modify disposition to protective supervision pursuant to Practice Book § 35a-16. The purpose of a consolidated trial is "to avoid multiplicity of litigation and to promote judicial efficiency." *State* v. *Ross*, 269 Conn. 213, 266, 849 A.2d 648 (2004). When ruling on a motion to modify disposition, the judicial authority "shall determine whether a modification is in the best interests of

[15] On appeal, the respondent argues that he has found *stable* housing. The specific steps required him to find *adequate* housing. The issue for the court was whether the respondent's housing was adequate given the age and needs of the child. See footnote 16 of this opinion.

the child . . . ." Practice Book § 35a-16. In ruling on the respondent's motion to modify disposition, the court found that "[the respondent] cannot even take care of and support himself. He lives with maternal grandfather in a one bedroom apartment, drives a car owned by the grandfather, is unemployed and relies on others for every facet of his existence. He has also been incarcerated for periods of time and is on probation. Although he claimed in testimony that he takes care of his children's needs, evidence was lacking as to the veracity of this assertion. It is noteworthy that [the respondent] has an extremely poor parenting record with his other children, for whom he has never provided support or substantial care. Having had three other children with three other women (the children are [eleven, eleven and four] years old) [the respondent] could very well have issues and responsibilities stemming therefrom, and would likely never be able to effectively parent, care for, or financially assist [the child] . . . ."

On appeal, the respondent argues that he has stable housing with the child's maternal grandfather in a one bedroom apartment.[16] The respondent also claims that he has income, but he was unable to produce pay stubs and admitted that he is paid under the table, which he understands does not meet the expectations of department personnel.[17] The respondent acknowledges that

[16] At the termination of parental rights trial, the respondent testified about his present living arrangements as follows:

"[The Respondent's Counsel]: [W]hat would the sleeping arrangements be if both of the kids were returned to your custody and you . . . continued to live [with the maternal grandfather]?

"[The Respondent]: Well, both of the children already have . . . beds available to them. So my father-in-law already said that it will be the same. It will be just me and the two children in the bedroom, and he will take the living room and the futon until I get a job and save up for my own apartment and let the kids have their own room."

[17] The respondent testified in part: "If [the children] are returned to my custody when I have a tax paying job, which [the department] wants me to have a tax paying . . . if I have them in my custody, there is state assistance, which will provide me with help in taking care of my children until I am

he has three older children for whom he does not provide on-going support. Moreover, he does not provide financial support for the child or LR. He therefore has not complied with the step to take care of the child's physical, educational, medical or emotional needs. He also failed to make appropriate arrangements for child care needs should he obtain legal employment. See footnote 12 of this opinion. We therefore conclude that there is clear and convincing evidence in the record to support the court's finding that the respondent failed to comply with the specific steps ordered.

## II

The respondent's second claim is that the court improperly found that he remains involved with the criminal justice system. The court found that the respondent has a significant criminal history predating the child's birth.[18] At the time the child was adjudicated neglected, in June, 2008, the respondent was ordered via specific steps to have no further involvement with the criminal justice system. The respondent has been arrested twice since that time. He was arrested first for possession of drugs with intent to sell and a second time because his fingerprints were found on a live bullet at the scene of an assault that occurred in May, 2008. In its memorandum of decision, the court found that the respondent remains on probation for his conviction of drug related charges.

The basis of the respondent's claim is that he was found not guilty of the assault charge. We have some

get a tax paying job, full-time job. And for me, it will be beneficial for me if they was to come to the house because I will be able to spend time that I have lost already with them. And if I get a job, when I get a job full-time, I have my mother-in-law to care for my children . . . both of the uncles to care for my children, to watch them while I work, or whatever the case may be. I have support."

[18] When the respondent was arrested in February, 2010, his bail was set at $500,000. He acknowledged that the amount of bail was based, in part, on his criminal record.

sympathy for this argument, however, the trial court did not find the respondent's incarceration while awaiting trial on the assault charge to be a basis to terminate his parental rights with respect to the child. The court found that the respondent was on probation on a drug related conviction. The respondent did not address the court's probation finding on appeal. We cannot conclude that the court improperly found that the respondent remains involved in the criminal justice system. Compare *In re Jocquyce C.*, 124 Conn. App. 619, 624, 5 A.3d 575 (2010); *In re Emerald C.*, 108 Conn. App. 839, 846–47, 949 A.2d 1266, cert. denied, 289 Conn. 923, 958 A.2d 150, 151 (2008). Should the respondent violate the terms of his probation, he well could be reincarcerated. The respondent's claim therefore fails.[19]

### III

The respondent's third claim is that the court improperly concluded that he was reluctant to comply with programs and that he has been involved with child protection services since 2004 and the services provided to him have been unsuccessful in mitigating the issues identified by child protective services. We disagree.

"[T]he adjudicatory determination to be made by the trial court is whether the parent of a child who has been found by the [trial] court to have been neglected and uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would

---

[19] In his brief and repeatedly at oral argument before this court, the respondent claimed that there was an "absence of any negative conduct following" his reunification with the child in November, 2009, and argued that it was improper for the court to rely on preunification behavior in evaluating the nature and extent of his rehabilitation. The respondent fails to cite any authority for this proposition. The fact that the respondent may not have been convicted of additional crimes following reunification does not negate the court's findings that he failed to gain insight into the mother's issues as they relate to the child or that he does not have adequate housing or employment, which support the conclusion that he failed to rehabilitate.

encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . . Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child." (Citations omitted; internal quotation marks omitted.) *In re Tabitha P.*, 39 Conn. App. 353, 360–61, 664 A.2d 1168 (1995).

"Although the standard is not full rehabilitation, the parent must show more than 'any' rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation." (Citations omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 500, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

The respondent argues that his involvement with child protective services stems from one incident in which he was the victim of domestic violence in 2004. The affidavit of LaDonn Barros, a department social worker, attests that the respondent informed her that he and the child's mother argue and that he sometimes grabs her arms and shakes her. More than one court ordered specific steps for the respondent to participate in domestic violence counseling and gain insight into the effect of domestic violence on children. The court also ordered the respondent to gain insight into the effect of substance abuse on children. The record indicates that the respondent initially refused to participate in hair sample tests for substance abuse but that he did so after he was released from prison.

The specific steps ordered for the respondent were intended to facilitate his rehabilitation. Whether the respondent was rehabilitated is demonstrated, not by mechanically tallying up his attendance at programs and services, but by whether he has gained insight into the problems that gave rise to the department's involvement in the life of the child and whether he has made appropriate changes in his behavior. Attendance at programs and services is not a means unto itself, but facilitates behavioral changes that contribute to rehabilitation. The respondent's direct testimony demonstrates his awareness of the issues he was facing and his failure to rehabilitate:

"[The Respondent's Counsel]: And so are you aware that [the department] has some serious concerns, mother's stability and substance abuse?

"[The Respondent]: Yes, very aware.

"[The Respondent's Counsel]: What's your current relationship with the children's mother?

"[The Respondent]: Well, I provide her with emotional support. And from this point, we visit each other, we see each other. We be intimate. But other than that, we have conversations and we are clear to each other that if the children come to me, that she won't be able to come around. I won't be able to see her like that, because I want the kids to be first of my life, as far as me raising them as a father. And once she is straight with as far as [the department and the department] feels she has no more issues and she is granted parental supervision, everything like she is supposed to be doing, I have no issues with her coming around if the kids are supposed to come to me. As long as the kids are living with me, she already knows that she won't be able to come around like that unless [the department] approves it or vice versa, you know."

On cross-examination by the assistant attorney general, the respondent testified further about the child's mother:

"[Assistant Attorney General]: You would keep mother at arm's length from the children, correct?

"[The Respondent]: Yes.

"[Assistant Attorney General]: Because, in your opinion, mother is not ready to parent; is that accurate?

"[The Respondent]: No.

"[Assistant Attorney General]: Well, then, why would you keep the mother away from her children?

"[The Respondent]: Due to issues that you all have with her.

"[Assistant Attorney General]: I see.

"[The Respondent]: So I am going to respect those decisions that you all make, and I'm going to respect that and enforce it.

"[Assistant Attorney General]: But in your opinion, mother is fully qualified to parent?

"[The Respondent]: When she was being a parent with my children, she was doing a real good job."

In response to a question from the court, the respondent testified, with respect to the mother: "We do want to be a family, but [the department] is making it not happen. They're saying we're not suitable for each other. They're saying [the mother] has an addiction problem."

The respondent's testimony demonstrates that he lacks an appreciation of the mother's substance abuse and parenting issues, and how those issues affect the child. Moreover, the respondent is dependent on the

children's maternal grandfather to meet his needs.[20] The respondent's lack of insight into the mother's issues along with his failure to obtain adequate housing and legal income supports the court's conclusion that he has not rehabilitated. Moreover, he is not able to provide for the physical, educational, medical or emotional needs of the child. The respondent also testified that he had no objection to granting guardianship of the child to her maternal grandmother, a woman who did not report to department personnel the mother's drug abuse while the child was in her care.[21]

In his reply brief, the respondent addressed the petitioner's argument that the respondent was "enmeshed in a relationship with the mother whose problems and drug use he minimized." The respondent contends that the court made no such finding and that the petitioner failed to raise the issue as an alternate basis to affirm the judgment terminating his parental rights with respect to the child. Moreover, the respondent argues that the petitioner's argument fails because the record does not support the assertion that he is enmeshed in a relationship with the child's mother. We disagree as the respondent's testimony clearly establishes, although he denies it, that he has an ongoing relationship with the child's mother. He testified that he provides emotional support for her, makes telephone calls for her and takes her to appointments. He also has intimate relations with the mother and impregnated her during the course of the trial.

---

[20] The respondent testified, in part, as to his relationship with the child's maternal grandfather: "Well, his purpose for letting me stay there is to getting back his grandchildren, which are my children, [the child and LR]. He supports me, as far as giving me a roof over my head. Whenever there is a job in construction—what he does—available, he takes me with him to help him out with his job. So, that's another form of me getting money. He provided me with a vehicle. He shared everything in his name. To do Chinese food delivery, from the day the kids come, I take them to appointments and do whatever I have to do with them, comfortably."

[21] See footnote 13 of this opinion.

The respondent also argues that, before his relationship with the child's mother may be relied on as a basis for termination, he has to be made aware that the relationship poses an obstacle to reunification. Even if the court did not issue a specific order with respect to the respondent's relationship with the mother and her family, "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." *In re Vincent D.*, supra, 65 Conn. App. 670. The respondent's testimony indicates that he is aware of the petitioner's concerns regarding the child's mother, but that he disagrees with those concerns. He fails to recognize the negative effect the mother's issues have on the child.

As to the respondent's argument that the court made no finding that he was enmeshed in a relationship with the child's mother, that finding is implicit in the court's decision. In two successive paragraphs in the memorandum of decision, the court found that, at the time the child was adjudicated neglected, one of the respondent's presenting problems was his continuing "to reside with [the] [m]other while she was abusing substances." The court found that final steps were ordered for the respondent on December 17, 2009, and on September 1, 2010, and that the respondent failed to comply with the steps to facilitate reunification. The December 17, 2009 specific steps include family counseling to "increase parenting skills, substance abuse, [domestic violence], address mental health." The September 1, 2010 specific steps include parenting and individual counseling to "address & gain insight regarding parental substance abuse & criminal involvement & the impact of these issues on the family & on children." As the respondent himself testified, he thinks the child's

mother is a good parent and that only the department believes she has issues that need to be addressed. Such testimony demonstrates that the respondent has not gained the insight necessary to be a responsible parent in the life of the child. Our courts are permitted to rely on evidence of a parent's continuing association with a party who poses a risk to a child in determining whether a parent has failed to rehabilitate. See *In re Jorden R.*, 293 Conn. 539, 562 n.20, 979 A.2d 469 (2009).

On the basis of our thorough review of the court's memorandum of decision and the record, we conclude that the court's finding that the respondent had failed to rehabilitate is not clearly erroneous. The finding is legally correct and supported by clear and convincing evidence in the record.

The judgment is affirmed.

In this opinion the other judges concurred.