******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE VICTOR D.*
(AC 37352)

Beach, Mullins and Bishop, Js.

*Argued October 15—officially released November 20, 2015***

(Appeal from Superior Court, judicial district of

Middlesex, Child Protection Session at Middletown, Elgo, J.)

*Roger N.*, self-represented, the appellant (respondent father).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (Commissioner of Children and Families).

*Isidro Rueda*, for the appellee (petitioner minor child).

*Benjamin D. Hollander*, guardian ad litem for the minor child.

*Opinion*

BEACH, J. The respondent father[1] appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, Victor D. The respondent essentially claims[2] that (1) the court erred when it found that the Department of Children and Families (department) had made reasonable efforts toward reunification and when it found that the respondent had failed to achieve a sufficient degree of personal rehabilitation, (2) the court violated the double jeopardy clause of the federal constitution, (3) the Commissioner of Children and Families (commissioner) prejudiced the respondent by withdrawing her support for reunification of the respondent with the child, and (4) the child's guardian ad litem was biased and had a conflict of interest. We do not agree and affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The child was born in May, 2010. The mother identified the respondent as the biological father of the child. The mother had a history of abusing substances since 2005, and both she and the child tested positive for cocaine and marijuana at the time of the child's birth. The commissioner immediately secured a ninety-six hour hold and filed a neglect petition and an ex parte order of temporary custody. The order was granted and specific steps were issued for the mother and the respondent on May 28, 2010. The respondent was not present at this proceeding.

In its memorandum of decision, the court found the following relevant facts. Although the respondent was aware that the mother was pregnant, he was not notified of the birth until June, 2010. When contacted by the department in September, 2010, the respondent stated that he wanted proof of his paternity. He did not participate in the September 21, 2010 neglect trial, at which the child was adjudicated neglected and committed to the commissioner. The respondent was determined by paternity testing to be the biological father on October 10, 2010; the child had been in the commissioner's custody for five months at that point. The child had "highly specialized needs and severe developmental delays which required a caregiver who was committed to understanding and caring for those needs." A number of social workers and service providers proceeded to work with the respondent to prepare him to address the child's complex needs.

Difficulties arose almost immediately after paternity was established. At the time that paternity was established, the respondent lived several hours away in Massachusetts; the physical separation made visitation and the scheduling of appointments difficult. The primary social worker assigned to the case had "persistent concerns" about the respondent's ability to care for the

child and testified that the child's "physical safety was consistently at risk" when he was in the respondent's care. The child's foster parents offered to assist the respondent in understanding the child's special needs. The respondent refused this support. The respondent was inconsistent with visits and frequently missed appointments with various service providers. He also had difficulty working with service providers, some of whom testified at trial that they felt that the respondent deliberately had tried to intimidate them.

Initially, all of the respondent's visits with the child were supervised. During several supervised visits, the child was injured and cried hysterically, and, though no one actually observed the respondent hurt the child, the primary social worker testified that she suspected that the respondent caused these injuries.[3] Additionally, the respondent was not receptive to the support that he was offered to improve his relationship with the child. When the department located a family therapist to help the respondent address his specific steps, the respondent, claiming that he did not need counseling, rejected the assistance. In the spring of 2011, the respondent became more consistent with visitation, but he continued to resist the recommendations of the child's service providers. One provider, Birth to Three, focused on the child's digestive issues. The respondent was given a list of foods that were safe for the child to eat. The respondent repeatedly challenged these recommendations and brought inappropriate food to sessions with the child.

On August 25, 2011, the commissioner filed a petition to terminate the respondent's parental rights. The respondent made several complaints to the department ombudsman, who conducted a very limited review of the case. After what the trial court deemed a "profoundly flawed and incomplete assessment" by the ombudsman, the local department office was directed to withdraw the petition in April, 2012. The case was reassigned to a new social worker.

In July, 2012, despite negative reports from the child's service providers and the respondent's reported lack of progress, the department decided to allow the respondent unsupervised visitation with the child. When the visits were unsupervised, the child, who was at that point two years old, threw violent tantrums when his service providers arrived at his foster parents' house to transport him to the respondent. After these unsupervised visits, the child demonstrated serious distress; he had nightmares, hit his foster parents, slammed his head on the floor, and regressed in his bathroom habits.

On October 23, 2012, the respondent filed a motion to revoke commitment. The commissioner filed a motion to revoke commitment and modify disposition to protective supervision on December 31, 2012. The hearing on these motions began on April 29, 2013, and

continued through January 10, 2014. The court consolidated for hearing a motion for overnight and unsupervised visits with the motion to revoke commitment. On January 28, 2014, the attorney for the child filed a petition to terminate the parental rights of the respondent and the mother. The commissioner initially joined the respondent in opposing the petition.

On April 21, 2014, the commissioner informed the court that she had changed her position, and she withdrew her own motion to revoke commitment. The court continued the trial until June 2, 2014. On June 2, 2014, the commissioner reported to the court that it supported the child's petition to terminate the respondent's parental rights. In its written November 7, 2014 decision, the court denied the respondent's motion to revoke commitment. Thereafter, the court found by clear and convincing evidence, as to the adjudicatory phase, that the department had made reasonable efforts to reunify the respondent with the child and that the respondent had failed to rehabilitate. As to the disposition, pursuant to § 17a-112 (j) (2), the court found by clear and convincing evidence that it was in the best interest of the child that the parental rights of the respondent and the mother be terminated. The court concluded that the respondent's motion for overnight visitation and any other outstanding motions were now moot. This appeal followed. We shall set forth additional facts as necessary.

I

We first address the respondent's claims regarding the court's conclusions terminating his parental rights. The respondent claims that the court erred by finding, for the purposes of General Statutes § 17a-112 (j),[4] that (1) the department had made reasonable efforts toward reunification, and that (2) the respondent had failed to achieve a sufficient degree of personal rehabilitation. We shall address these claims in turn.

The principles that guide our review are as follows. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase . . . [in which] the trial court determines whether termination is in the best interests of the child." (Footnote omitted; internal quotation marks omitted.) *In re Etta H.*, 146 Conn. App. 751, 755–56, 78 A.3d 295 (2013).

Our Supreme Court recently clarified the appropriate standard by which to review trial court judgments terminating parental rights. See *In re Shane M.*, 318 Conn. 569, 587–88,    A.3d    (2015). "We have historically

reviewed for clear error *both* the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B)." (Citation omitted; emphasis in original; footnote omitted.) Id. Similarly, the court's determination as to whether the department made reasonable efforts toward reunification is a legal conclusion drawn from the court's subordinate factual findings. Therefore, we apply a clearly erroneous standard of review as to the court's underlying factual findings, and we review the court's legal determinations of reasonable efforts and of failure to rehabilitate for sufficient evidence. See id.

"A [subordinate factual] finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Keyashia C.*, 120 Conn. App. 452, 455, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

A

Reasonable Efforts

The respondent claims that the court erred by determining that the department had made reasonable efforts toward reunification. The respondent's argument on this point is brief; the respondent essentially claims that the department's efforts to reunify were per se unreasonable because the reunification did not occur. He argues that "[t]he [department] went through a long and exhaustive process of court and blatantly didn't take the obvious next steps to reunify. Instead they dragged the child through long legal battles when the biological father had been meeting all expectations and progressing to a level where they should have moved forward in their placement." We do not agree.

To terminate a parent's parental rights, "the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the

parent is unable or unwilling to benefit from reunification efforts. In accordance with [§ 17a-112 (j)], the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 348, 789 A.2d 1158 (2002).

We conclude that there was sufficient evidence in the record to support the court's conclusion that the department's efforts to reunify were reasonable. The court, in its lengthy November 7, 2014 written decision, recounted the efforts made by the department. The court found that these efforts began when the respondent's paternity was established. The primary department social worker assigned to the child's case "made extraordinary efforts to facilitate visitation, coordinate providers, and implore [the respondent] to take advantage of Birth to Three Services and medical visits so that he could better understand [the child's] needs." The respondent had an inflexible schedule, and the department accommodated his scheduling requests. The department sought to facilitate a constructive relationship between the respondent and the child's foster parents, who offered to help the respondent to understand the child's needs and the special care that he required. The department accommodated the respondent when it reimbursed him for mileage on the occasions that he visited the child, located a single provider who could work with the respondent on several of the specific steps in one session, made referrals to providers, and coordinated the respondent's visits to Connecticut with the child's appointments with various service providers to enable the respondent to attend.

The court found that the department had made reasonable efforts—indeed, that it went "above and beyond what would be considered reasonable efforts"—after evidence showed that the department made significant efforts to include the respondent in and to provide the respondent with myriad appropriate services[5] and that department social workers diligently tried to accommodate the respondent's scheduling conflicts and financial needs. On occasions when the respondent canceled or missed visits with the child or his service providers—and such occasions were frequent—the department urged providers to rearrange their schedules to fit the respondent's availability. The department also sent monthly e-mails to the respondent to ensure that his schedule was accommodated appropriately; the respondent often did not reply to these e-mails, but the department persistently followed up

with him to confirm appointments and visits. Notwithstanding these efforts, the respondent complained about his case to the department ombudsman. After what the court labeled a "profoundly flawed and incomplete assessment of the case" by the ombudsman, the department assigned a new social worker to the case.

The court found that after this change of assignment, the department continued to accommodate the respondent by "approv[ing] [the respondent's] request for an overnight stay in a hotel every week starting in July, 2012, so that [the respondent] could have visits twice a week. By October, 2012, [the department] increased the length of visits and included an unsupervised component. [The department] [e]nsured that all services were paid for, including individual therapy . . . ."

The record indicates, and the court found, that the department ensured that the respondent and the child received services intended to effectuate reunification. In light of these findings, the respondent's argument that, because reunification ultimately did not occur, the department's efforts toward that end were unreasonable is without merit.

We conclude, therefore, that there is sufficient evidence in the record to support the court's determination, which was made by clear and convincing evidence, that the department made reasonable efforts to reunify the respondent with the child.

B

Personal Rehabilitation

The respondent next claims that the court erred by concluding that he had not rehabilitated within the meaning of § 17a-112 (j) (3) (B). The thrust of the respondent's appeal is that the court improperly weighed the evidence before it and ignored testimony from the witnesses favorable to the respondent's position. We do not agree.

Our statute provides for the termination of parental rights when a child "has been found by the [trial court] . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (i); see *In re Elvin G.*, 310 Conn. 485, 506, 78 A.3d 797 (2013) ("[t]he prior provision of specific steps is required in any case in which the commissioner seeks to terminate parental rights on the ground of a parent's failure to rehabilitate, regardless of whether the petition is filed pursuant to § 17a-112 [j] [3] [B] [i] or [ii]" [emphasis in original]).

We previously have explained that the standard for rehabilitation is set by the "expectations following the adjudication and disposition of the prior neglect [proceeding]." (Internal quotation marks omitted.) *In re Shane M.*, 148 Conn. App. 308, 319–20, 84 A.3d 1265 (2014), aff'd, 318 Conn. 568,    A.3d    (2015). "In other words, whether a parent has rehabilitated under the statute depends on whether he has met the expectations giving rise to the specific steps."[6] Id.

The completion of the specific steps, however, does not guarantee reunification. See *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001). "Although a parent may have participated in the programs recommended pursuant to the specific steps ordered, a court may properly find that the parent has failed to achieve rehabilitation." *In re Destiny R.*, 134 Conn. App. 625, 627, 39 A.3d 727, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012). "The ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time." Id.; see *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

The court found by clear and convincing evidence, in accordance with § 17a-112 (j) (3) (B), that the respondent had "failed to rehabilitate within a reasonable period of time, given the age and needs of [the child]." In its assessment of the respondent's rehabilitation, the court noted that the respondent struggled with the child's service providers. "From the outset, and in a pattern that has persisted throughout this case, the [respondent] has blamed others for his own deficiencies. . . . [The respondent] has not been able to demonstrate a genuine ability to work with providers with whom he does not agree . . . ." The court described the respondent as controlling and manipulative and referred to specific instances in which the respondent made misrepresentations to the department and to the child's various service providers.

The court also doubted the respondent's ability to care adequately for his son. Despite years of working with the child's service providers, "the manifestations of [the respondent's] inability and/or refusal to meet [the child's] need to grow and thrive with respect to his emotional, psychological, and/or physical need for safety and security and with respect to his emerging and ever evolving need for independence are many . . . ." The court could not "reconcile how [the respondent] could safely or appropriately care for [the child] when, even in January 2013, the simplest of instructions, such as being sure to hold [the child's] hand or be close when he attempts to walk down the stairs, was ignored or required repeated assertions and reminders over several weeks' time." On another occasion, in April, 2013, a service provider testified that she observed the

respondent order the child to keep food in his mouth for up to fifteen minutes when the child was unable to finish his meals, despite her insistence that the respondent should not force the child to eat when he was not hungry.

Given what the court termed the respondent's "long-standing persistent issues with controlling behaviors," it was troubled by a series of injuries that the child sustained while spending time with the respondent. Beginning in 2012, a series of marks and bruises appeared on the child. The court noted that, although some of these injuries may have been the result of normal toddler activity, one service provider testified that the respondent's explanations for how these injuries occurred were confusing and illogical. The child's foster parents increasingly were concerned with marks and bruises located in unusual places; for example, the foster parents reported that the child had bruises on his forearm that resembled a handprint. The child reported to his foster parents that "Daddy Roger" was "mean" to him and hit him.

Finally, the court cited the child's need for permanency and security as an overriding concern in its assessment of the respondent's rehabilitation. See *In re Zion R.*, 116 Conn. App. 723, 739, 977 A.2d 247 (2009) (holding that it was proper to consider child's young age and need for permanency in finding that respondent had not achieved rehabilitation). The court was "convinced that [the respondent] cannot and will not handle [the child's extreme physical reactions and behaviors] appropriately and that [the child] will be at extreme risk if ever in [the respondent's] exclusive care."

The court then listed specific reasons why it did not find that the respondent had sufficiently rehabilitated, including the respondent's: "(1) . . . inability to tune into and/or understand [the child's] needs, both specialized needs and the ordinary developmental needs of the child, (2) . . . resistance to and aggression in receiving support and training services from various providers to help him understand and address the child's ever evolving needs, and (3) . . . refusal to accept that individuals who are highly trained and/or experienced child care professionals . . . have far greater, superior and invaluable information, insights and understanding of [the child's] needs which [the respondent] also required in order for the child to successfully transition into his care."

The respondent essentially disputes the court's determination of credibility; however, it was within the province of the trial court to credit or to discredit testimony as it deemed fit. The respondent claims that the court did not properly credit the testimony of Ralph Balducci, a court-appointed psychologist, Bruce Freedman, the respondent's psychotherapist, and Collette Smith, a parent coach. He also claims that the court ignored por-

tions of the testimony of parent coach Kimberley Browe that indicated that he had achieved rehabilitation. Our function is to determine whether the court's findings were factually supported. It is not within our purview to "retry the case or pass upon the credibility of the witnesses." (Internal quotation marks omitted.) *In re Jason M.*, 140 Conn. App. 708, 719, 59 A.3d 902, cert. denied, 308 Conn. 931, 64 A.3d 330, cert. denied,     U.S.     , 134 S. Ct. 701, 187 L. Ed. 2d 564 (2013). "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re Jason R.*, 129 Conn. App. 746, 772–73, 23 A.3d 18 (2011), aff'd, 306 Conn. 438, 51 A.3d 334 (2012). The respondent has pointed to no part of the record that indicates that the court acted clearly erroneously in evaluating the credibility of witnesses and weight to be accorded their opinions. We will not second-guess the court's opinion of these witnesses.

Although we acknowledge the respondent's efforts to satisfy the specific steps, the court's conclusion that the respondent did not achieve rehabilitation sufficient to warrant reunification is amply supported by factual findings in the record and meticulously explained in the court's memorandum of decision. Thus, the court's determination that the respondent did not rehabilitate sufficiently for the purposes of § 17-112 (j) (3) (B) was supported by sufficient evidence.

II

We next address the respondent's claim that the court violated the double jeopardy clause of the federal constitution by permitting the same witnesses who had testified at a 2012 hearing on a motion to revoke commitment to testify again at the trial resulting in termination. This claim is without merit. "It is well settled that prosecutions or convictions for double jeopardy purposes arise only from proceedings that are essentially criminal." (Internal quotation marks omitted.) *State* v. *Burnell*, 290 Conn. 634, 645, 966 A.2d 168 (2009). Our Supreme Court has made it clear that the double jeopardy clause does not apply to termination of parental rights cases. *Cookson* v. *Cookson*, 201 Conn. 229, 237, 514 A.2d 323 (1986) (stating that "parents do not have a 'double jeopardy' defense against repeated state termination efforts"). Thus, this claim is without merit.

III

The respondent also claims that he suffered "extreme prejudice" as a result of the commissioner's change in

her position of support for reunification to a position of support for the termination of parental rights. The respondent argues that the commissioner changed her position only because she learned of an investigation into allegations of the respondent's abuse of a younger son in Massachusetts.[7] A change in the commissioner's position, however, is not a basis to overturn judgment rendered by a court after it weighed the totality of evidence presented at trial.

Moreover, the trial court's decision in this case was not premised on any finding by the Massachusetts Department of Children and Families; the court referred to the finding as "cumulative evidence." Furthermore, the commissioner was free to change her position for whatever reason. For these reasons, this claim is without merit.

IV

Finally, the respondent claims that the child's guardian ad litem had a conflict of interest and was biased against the respondent. The respondent did not raise this issue before the trial court; therefore, we decline to review it. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequently to the trial"); see also *In re Anna Lee M.*, 104 Conn. App. 121, 124 n.2, 931 A.2d 949, cert. denied, 294 Conn. 939, 937 A.2d 696 (2007).

Accordingly, the trial court did not err in terminating the respondent's parental rights.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** November 20, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We refer in this opinion to the respondent father as the respondent and to the respondent mother as the mother. The mother did not appeal from the judgment terminating her parental rights.

[2] The respondent also claims that the court erroneously declined to decide various motions, including a motion for overnight visitation. The court did not rule on these motions, but, rather, found them moot. "Having terminated [the respondent's] parental rights, the motion for overnight visitation and any outstanding motions relative to visitation are now moot." Because we affirm the court's termination of the respondent's parental rights, we agree with the court that these motions are moot.

[3] The court explained the apparent inconsistency between the supervised nature of the visits and the fact that the child was injured: "[The primary social worker] credibly described . . . how she could not see what actually happened to [the child] because on two occasions, [the respondent] positioned himself so he could not be fully seen. This court has no difficulty, therefore, making a reasonable inference that [the respondent] was responsible for hurting [the child]."

[4] General Statutes § 17a-112 (j) provides in relevant part that the court "may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is

unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[5] The services that the department provided to the respondent and the child included individual therapy, family therapy, physical therapy with multiple providers to address different issues, speech therapy, feeding therapy, parent coaching, one-to-one parenting services, and other parent education services. These services were intended either as direct support for the respondent or for the child. The respondent was encouraged to partake of the services that were directed at the child's care and treatment of his special needs.

[6] The respondent was provided with specific steps. These steps included: (1) cooperate with recommended service providers for substance abuse treatment, (2) attend all appointments set by the department, (3) avoid further involvement with the criminal justice system, (4) apprise the department of his whereabouts, (5) secure and maintain adequate housing and legal income, (6) participate in counseling and make progress toward the identified parenting and individual treatment goals, and (7) visit with the child as often as permitted.

[7] According to the respondent, these allegations later were determined to be without a reasonable basis. Apparently that determination was made too late to be presented to the trial court in the present case, and, in any event, the court apparently was not aware of later determinations in Massachusetts.

––––––––––––––––––––––––––––––