**********************************************************

   The "officially released" date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

   This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

**********************************************************

# IN RE JOSIAH D. ET AL.*
## (AC 44096)

Bright, C. J., and Lavine and Elgo, Js.**

*Syllabus*

The respondent father appealed from the judgments of the trial court terminating his parental rights with respect to his two minor children. He claimed that the court committed reversible error by failing to notify him that it would be drawing an adverse inference from his decision not to testify, and that this court should exercise its supervisory authority over the administration of justice to adopt an advisement requiring the trial court to affirmatively notify him that it would be drawing an adverse inference upon his decision not to testify. *Held*:

1. The trial court properly notified the respondent father that it may draw an adverse inference from his decision not to testify: prior to the presentation of evidence, the court notified the father of his rights pursuant to *In re Yasiel R.* (317 Conn. 794), which included the right to remain silent and the notice required to a parent under the applicable rule of practice (§ 35a-7A), that the judicial authority may draw an adverse inference from his failure to testify, which was entirely consistent with the holding of our Supreme Court that the notice be given at the very start of the termination trial, before a decision as to whether to challenge evidence has been communicated to the court, and to all parents involved in a termination trial, not just to those parents whose attorneys have made a tactical decision not to contest evidence; moreover, contrary to the father's claim, § 35a-7A does not require a second notice to the parent that the court would be drawing an adverse inference from a parent's failure to testify, as the rule itself provides notice to a parent that the court may draw an adverse inference, and a notice provided at the start of the trial is the least coercive manner of advising a parent of his or her right to remain silent and the possible consequences of doing so; furthermore, even if it were assumed that the court was required to affirmatively notify the father that it would be drawing an adverse inference from his failure to testify, the notice given at the beginning of the termination trial was proper, and any impropriety was harmless in light of the court's detailed findings of fact in its memorandum of decision and its subsequent articulation, which dispelled any notion that the court's drawing of an adverse inference from the father's decision not to testify was determinative of the court's decision to terminate his parental rights.

2. This court declined to exercise its supervisory authority over the administration of justice to require a trial court in a termination of parental rights trial to affirmatively notify a parent that it would be drawing an adverse inference from the parent's decision not to testify, notice that is beyond what is required by § 35a-7A; this case did not present the type of extraordinary circumstance for which the exercise of supervisory power was intended, and § 35a-7A ensures the fair and just administration of the courts in termination of parental rights cases.

Argued November 9, 2020—officially released January 13, 2021***

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters, where the matter was tried to the court, *Brillant, J.*; judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed*.

*Karen Oliver Damboise*, for the appellant (respondent father).

*Kim Mathias*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon* and *Evan O'Roark*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent father, Geraldo D. (father), appeals from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his sons, Josiah D. (Josiah) and Jovani D. (Jovani) (collectively, sons or boys),[1] on the ground that he had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (i). On appeal, the father does not challenge the trial court's findings and conclusions but claims that (1) the court committed reversible error by failing to notify him that it would be drawing an adverse inference from his decision not to testify in accordance with Practice Book § 35a-7A and *In re Samantha C.*, 268 Conn. 614, 847 A.2d 883 (2004), and (2) this court should exercise its supervisory authority to adopt a canvass requiring the trial court to notify the father that the court would draw an adverse inference upon his decision not to testify. The petitioner counters that the court properly notified the father in accordance with Practice Book § 35a-7A, but if this court determines that the court's notice was improper, the error was harmless, as it did not adversely affect the outcome of the trial.[2] We conclude that the court properly notified the father that it may draw an adverse inference from his decision not to testify and decline the father's invitation to exercise our supervisory authority to require any notice beyond what is required by Practice Book § 35a-7A. We affirm the judgments of the trial court.

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3) (B) (i)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019). "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation

marks omitted.) *In re Destiny R.*, 134 Conn. App. 625, 629, 39 A.3d 727, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012).

The record discloses that employees of the Department of Children and Families (department) had been involved with the boys' family since 2004, as a result of a referral regarding one of their mother's older children. In May, 2016, and again in November, 2016, the petitioner filed neglect petitions and motions for orders of temporary custody with respect to the boys, but subsequently withdrew them and the boys were returned to their parents. The department, however, continued to be involved with the family in connection with the mother's older child and pursuant to a referral from local police. The petitioner invoked a ninety-six hour administrative hold on the boys on March 24, 2017. On March 28, 2017, the petitioner filed motions for orders of temporary custody and neglect petitions as to each of the boys. On May 31, 2017, the court, *Ginocchio, J.*, adjudicated the boys neglected. On April 13, 2018, the petitioner filed petitions for the termination of the parental rights of the father and the mother as to each of the boys. As to the father, the petitioner alleged, pursuant to § 17-112 (j) (3) (B) (i), that, in a prior proceeding, the boys were found to have been neglected, abused, or uncared for, and that the father had failed to achieve a sufficient degree of personal rehabilitation that would encourage the belief that within a reasonable time considering the ages and needs of his sons, the father could assume a responsible position in their respective lives.

The termination of parental rights trial was held before the court, *Brillant, J.*, on September 24, 25, and 26, and December 10, 2019. On February 24, 2020, the court issued a memorandum of decision, which included the procedural history, the court's factual findings and conclusions, and an order terminating the father's parental rights as to the boys. In its decision, the court noted that the father had appeared for trial and was represented by counsel.[3] The court advised the father of his rights pursuant to *In re Yasiel R.*, 317 Conn. 773, 794, 120 A.3d 1188 (2015).[4] The court noted that the petitioner had introduced twenty-eight exhibits and called eight witnesses at trial. The father was represented by counsel, but he "did not introduce any exhibits, did not testify on his own behalf, and did not call any witnesses." The court stated that it drew "an adverse inference with regard to [the] [f]ather." At the petitioner's request, the court took judicial notice of the court record.

The court found that on February 10, 2017, local police reported to the department that a motorist had seen then three year old Josiah running across the street in heavy traffic. Josiah had been playing in the yard of the family home under the father's supervision, but the

father did not realize that Josiah had left the yard until he saw him across the street with the motorist and the police. At the time, the department investigated the family home and found that it was cluttered and needed to be cleaned.

On March 23, 2017, an elementary school staff member reported to the department that Josiah had not attended preschool since March 9, 2017. The department attempted to visit the family home on March 23, 2017, but no one was home. The department visited the nearby maternal grandmother's home. The maternal grandmother informed the department that due to intimate partner violence between the father and the mother, she financially assisted the mother in leaving the home the mother shared with the father. The department returned to the home and met the father, who informed the department that the mother had taken the boys on a vacation because he and the mother could not afford heat or electricity in the home. The department observed that the home was cold, cluttered with laundry, smelled of dirty diapers, and appeared to be without electricity.

On March 24, 2017, the department invoked a ninety-six hour administrative hold on the boys due to its concerns regarding their lack of adequate housing. On March 28, 2017, the court, *Hon. Jonathan J. Kaplan*, judge trial referee, granted the petitioner's motions for orders of temporary custody of the boys. The petitioner had filed neglect petitions on behalf of each of the boys as to each of his parents on March 17, 2017. On May 31, 2017, Judge Ginocchio adjudicated the boys neglected and committed them to the care of the petitioner.[5] On February 8, 2018, Judge Ginocchio and, on January 10, 2019, the court, *Maronich, J.*, approved the department's permanency plans for termination of the father's parental rights as to his sons and for the boys to be adopted. On April 13, 2018, the petitioner filed petitions for termination of the father's parental rights as to his sons, alleging in part that the father had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the boys, the father could assume a responsible position in their lives pursuant to § 17-112 (j) (3) (B) (i).[6]

The court found that the father was born in 1975, and that he has a wife and two children in Brazil. His primary language is Portuguese, and he relies on the mother for interpretation. He is an undocumented individual, who works as a landscaper, and has no criminal history in the United States. In June, 2017, after the boys had been committed to the petitioner's care, the father was referred to the Midwestern Connecticut Council of Alcoholism, Inc. (MCCA) for a substance abuse and mental health assessment. His test results were negative and no treatment recommendations were

made for him. In September, 2018, the father again was referred to MCCA to confirm that he had no substance abuse issues, but he did not comply with the referral.

Although the father had no reported substance abuse or mental health issues, the department referred him to the Women's Center and to the Center for Safer Communities for parenting classes, intimate partner violence, and individual counseling beginning in August, 2018. The department made the referrals due to its concerns regarding the father's judgment and decision-making skills as a parent, and also because the maternal grandmother and local police had reported that the father was involved in intimate partner violence. The father also was referred to Family and Children's Aid for individual therapy with a Portuguese speaking clinician. The father did not comply with the services offered.

The court also found that the father is oblivious to the mother's substance abuse issues and was not aware that she needed methadone maintenance.[7] Although the father made his whereabouts known to the department, he did not cooperate with the department's requests to visit the family home and did not allow the department to assess it until days before trial. He failed to keep all of the appointments set by the department. The father did not attend a parenting program, did not attend meetings with ABLE Home Healthcare (ABLE) to understand and learn how to care for Josiah's special needs, and he did not attend meetings with the Birth to Three program for Jovani.

In 2019, the department asked the father to undergo another substance abuse evaluation because the mother was actively using drugs, and it had been approximately two years since his last assessment. The father complied with the court-ordered evaluations. The father, however, did not sign releases granting the department permission to communicate with or to gather information from all service providers. The department arranged for the father to visit with the boys for one hour, one day a week, but the father did not attend all of the scheduled visits.

The court made the following findings with respect to each of the boys. Josiah was born in September, 2013. The mother took methadone during her pregnancy with him and, therefore, he was exposed to methadone in utero. Following his birth, he spent several weeks in the neonatal intensive care unit of a hospital where he was treated for drug withdrawal. Josiah and his younger brother, Jovani, were removed from the care of their parents on March 24, 2017, due to intimate partner violence and lack of adequate housing. At the time of his removal, Josiah presented with delayed language development, social and emotional issues, and physical aggression. He was not verbal, not toilet trained, and his development was comparable to that of an eighteen to thirty month old child. Josiah was

diagnosed with autism, and he was provided with in-home services for fifteen to twenty hours per week to learn life skills through ABLE. Josiah's foster parents engaged in 50 percent of the hands-on activities with him.

Due to Josiah's developmental delays and the inability of some of his former foster parents to meet his special needs, he had multiple foster care placements between March and July, 2017. At the time of trial, he had been in the same nonrelative therapeutic foster home since July, 2017. With the assistance of special education classes and in-home behavioral support, the court found that Josiah was thriving, despite having had multiple caregivers. Josiah and Jovani were not placed together because Josiah requires one-on-one attention to address his developmental needs. The boys visit together with their parents once a week. Josiah has bonded with his foster parents, who love him and are willing to adopt him.

Jovani was born in December, 2015. Due to her prior heroin addiction, the mother took methadone during her pregnancy and thus exposed Jovani to the drug. He has been diagnosed with attention deficit hyperactivity disorder and post-traumatic stress disorder. He lived with his parents until he was removed from their care on March 24, 2017, due to his parents' intimate partner violence and inadequate housing. He was fifteen months old at the time and was placed in a nonrelative foster home, where he continued to reside at the time of trial. When he was placed in foster care, Jovani was not able to chew or to eat solid food. He could not walk and spoke by " 'babbling.' " The Birth to Three program reported that he had a global developmental delay and immediately began to provide him with physical therapy, occupational therapy, and speech therapy. Due to his medical diagnoses, he received parent involved treatment, psychotherapy, and parent-child management, once per week. Those treatment programs required a consistent caregiver to attend therapy with Jovani on a regular basis in order for him to feel safe and to be able to process all that had occurred in his life, including having been removed from his parents' home. He needs therapy on a consistent basis so that he can regulate his feelings and not feel afraid, and he requires services for communication and fine motor skill development and problem-solving. Jovani's development had progressed at the time of trial so he no longer was receiving services from Birth to Three, but he still was receiving occupational and speech therapy.

The court also found that as of the adjudicatory date,[8] the petitioner has known of the father's whereabouts and continuously has offered him services. The court therefore found by clear and convincing evidence that the department had made reasonable efforts to locate and to offer the father appropriate services to facilitate

his reunification with the boys. Those services included a referral to a Portuguese speaking therapist for individual therapy so that the father could understand the boys' special needs; services to help the father understand the mother's substance abuse issues; services to teach the father appropriate coping skills due to his history of intimate partner violence; Birth to Three to engage the father in Jovani's developmental services; information regarding the ABLE program to help the father understand and care for Josiah's needs and communication; guidance and encouragement to engage with Josiah's school regarding his individual education program; assessment of relative resources for foster care placement; administrative review of treatment plans, and case management services. The department also arranged for the father to visit with the boys weekly. The court further found that the father was unwilling to benefit from the reunification efforts the department offered him.

In addition, the court found by clear and convincing evidence that the department had met its burden and proved that the father had not achieved a degree of personal rehabilitation that would encourage the belief that within a reasonable period of time, given the ages of the boys, their special needs, and their need for permanency, the father could assume a responsible position in the boys' lives. This is especially true because Josiah has autism and relies on many developmental and behavioral services. Jovani also has special needs and requires therapy. The department scheduled weekly visits for the father and his sons, but the father did not attend them all. Initially, the department provided transportation for the father from the family home to the visitation site, but transportation ceased in approximately April, 2019, due to the father's inconsistent participation and logistical problems. The court found that the boys had been out of the father's care since March, 2017, and that they were in need of permanency and stability.

Wendy Levy, a clinical psychologist, evaluated the father and reported that he has cognitive limitations and is dependent on the mother. He failed to engage in the services recommended to him, particularly parenting classes to learn how to care for the boys who have special needs. According to Heather Bullock of ABLE, due to Josiah's autism and behavior, the father would need to be extremely diligent and consistently involved, otherwise Josiah's developmental progress could regress. Josiah's behavior could worsen as his language skills suffer.

The father was offered numerous services to aid his reunification with his sons, including substance abuse evaluation services, mental health services, parenting education, and supervised visits, but he was unwilling to complete his court-ordered specific steps to facilitate

reunification. The father's primary issues are lack of adequate decision-making for his sons and lack of appropriate judgment as he remained in a relationship with the mother even after the boys were taken from their care and two of the mother's other children were removed from her care. He has not taken the steps necessary to gain an understanding of the boys' special needs.

The court found that, although the father does not have substance abuse issues, he was still required to complete a parenting program and an intimate partner violence program, but he completed neither one. The father argued that there was no need for an intimate partner violence program because there had been no more such incidents between him and the mother. The father, however, continues to associate with the mother who has a track record of either injuring her children or not taking care of their many needs, which stifles the children from thriving emotionally, physically, developmentally, and educationally. The father remains in a relationship with the mother and has failed to do anything of substance proactively or reactively, with or without the mother, to advance his ability to properly care for his sons.

The court concluded that the father is unable to meet the developmental, emotional, educational, and moral needs of his sons. By all indications, the father cannot and will not provide for the boys' safe shelter, nurturance, and security. He refused to cooperate with the department and did not consistently attend scheduled visits with his sons. The court found that the father had failed to achieve a reasonable degree of rehabilitation to care for his sons.

The court further found that the father failed to gain sufficient insight into his issues to the extent necessary for the boys to safely return to his care. The father failed to achieve sufficient personal rehabilitation by failing to acquire adequate housing on a timely basis, failing to benefit from parenting education, failing to benefit from intimate partner violence education, and failing to benefit from department assistance in educating him about his sons' special needs. The court recognized that the father is a hard worker and does not have a substance abuse problem. However, he failed to learn how to be a parent to his sons who have special needs because he did not attend educational programs and meet with service providers. The court found on the basis of credible testimony and documentary evidence, pursuant to General Statutes §§ 17a-112 (j) (1) and 17a-111b (a), that the petitioner had met her burden of proof by clear and convincing evidence that the father failed to achieve the degree of rehabilitation that would encourage the belief that in a reasonable time, he could assume a responsible position in the lives of Josiah and Jovani.

The court then addressed the dispositional require- ments of § 17a-112 (k).[9] The court made the following written findings. The department had made reasonable efforts to reunite the father with his sons by offering him timely and appropriate services. The father refused the services offered to him and, therefore, did not fulfill his obligations pursuant to the specific steps ordered by Judge Ginocchio on May 31, 2017. Because he failed to comply with the specific steps, the father has failed to benefit from the services the department offered to him, which had a negative impact on the reunifica- tion process.

Six and one-half year old Josiah is happy to see his father when they visit. He has autism and relies on his foster parents to meet all of his needs, including participation in ABLE, which helps Josiah accomplish the tasks of daily living. He has bonded with his foster parents, who are nurturing, loving, and ready, willing, and able to adopt him.

Jovani has lived with his foster mother since he was fifteen months old; he is now four years old. He has bonded with his foster mother, who has devoted a great deal of time to help him grow developmentally, educa- tionally, physically, and emotionally. Jovani enjoys his visits with his father, but he looks to his foster parents to fulfill his needs on a daily basis. His foster parents are committed to loving and caring for him and are willing to adopt him.

The boys' foster parents are attentive to the boys' respective special needs. The boys refer to their respec- tive foster mothers as " 'mom.' " The court found that, although the boys and the father love one another, much more is required for the father to be reunified with them.

Pursuant to its previously discussed findings, the court concluded that the father had made insufficient efforts to adjust his individual circumstances, conduct or conditions to make it in the best interests of the boys to return safely to his care in the foreseeable future. The father has not been able to put the boys' interests before his own, and he has failed to take advan- tage of the services offered to him to facilitate reunifica- tion. The father sat idly by while the mother struggled with substance abuse. He did not take a leadership role in taking care of his sons. Under the care of their foster families and with the assistance of service providers, the boys have thrived in nurturing, stable, and loving environments. To take them from their foster environ- ments would cause them to suffer.

Finally, the court found that there was no credible evidence that the father has been prevented from main- taining a meaningful relationship with either Josiah or Jovani. The department encouraged him to maintain a relationship with the boys. No unreasonable act or

conduct by any person or agency nor the father's economic circumstances has prevented him from maintaining a meaningful relationship with his sons. The father's failure to maintain a meaningful relationship with his sons is a result of his own actions or circumstances in refusing to cooperate with the services provided to him.

When determining whether termination of the father's parental rights is in the best interests of the boys, the court considered the factors in § 17a-112 (k). See footnote 9 of this opinion. The court made written findings regarding the termination of the father's parental rights as to the boys and found by clear and convincing evidence that the only way the boys will find stability, continuity, continued growth and development is through permanency. The father is not able to assume a responsible position in the boys' lives given their ages, special needs, and immediate need for permanency. The court concluded that grounds exist to terminate the father's parental rights as he had failed to rehabilitate and that it is in the best interests of the boys to do so. The court, therefore, ordered the parental rights of the father terminated and appointed the petitioner the boys' statutory parent for the purpose of securing their adoptions as expeditiously as possible.

Thereafter, the father appealed and, on May 15, 2020, filed a preliminary statement of issues, i.e., whether (1) the court committed reversible error by failing to notify him that it would draw an adverse inference upon his decision not to testify in accordance with Practice Book § 35a-7A and *In re Samantha C.*, supra, 268 Conn. 614, and (2) this court should exercise its supervisory authority to adopt an advisement affirmatively notifying him that the court would draw an adverse inference upon his decision not to testify.

On June 15, 2020, the petitioner filed a motion for articulation, requesting that the trial court articulate its February 24, 2020 memorandum of decision regarding the court's decision to draw an adverse inference against the father because he did not testify at trial. The petitioner stated that the court's decision was ambiguous with respect to the significance of the adverse inference the court drew against the father, which is the subject of the issues the father raised on appeal.[10] The father did not oppose the motion for articulation.

The court granted the petitioner's motion for articulation on July 17, 2020, and issued a memorandum of decision addressing the petitioner's five questions. "The court drew an adverse inference against the father . . . pursuant to *In re Samantha C.*, [supra] 268 Conn. 614 . . . for his choice not to testify at trial. . . . The father's choice not to testify, merely showed the court that [the] father had nothing favorable to say to demonstrate that he could properly care for his children or

assume a responsible position in their lives. Even without the adverse inference drawn by the court, the court carefully considered all of the evidence and statutory criteria and specifically made findings of fact upon which it relied. . . . The court's findings of fact were found by clear and convincing evidence, which did not rely on the adverse inference [drawn] against [the] father. Even if the court had not [drawn] an adverse inference against [the] father, the court still would have found by clear and convincing evidence that [the] father was unwilling to benefit from the department's reasonable reunification efforts, based on the findings of fact which were fully articulated in the decision. . . . The court would have made the same findings of fact and conclusions of law by clear and convincing evidence, resulting in it being in the best interests of the minor children to terminate the parental rights, even without the court having drawn an adverse inference against [the] father for his failure to testify. The court's determination that termination of the parental rights was in the best interests of the minor children was based on the findings of fact and statutory criteria that were fully articulated in the decision." We now address the claims raised by [the] father in the present appeal.

I

The father first claims that the court committed reversible error by failing to notify him that *it would be drawing* an adverse inference from his decision not to testify at the termination of parental rights trial contrary to Practice Book § 35a-7A and *In re Samantha C.*, supra, 268 Conn. 614. We disagree.

As previously set forth, prior to the presentation of evidence, the trial court notified the father of his rights pursuant to *In re Yasiel R.*, supra, 317 Conn. 794, which included an advisement of his rights under Practice Book § 35a-7A.[11] Specifically, the court stated: "[Y]our decision to testify or not testify at this termination of parental rights trial is yours to make. However, if you choose not to testify whether fully at the trial or any other partial hearing, the trial judge *may draw an adverse inference*, which means it could be held against you. It could be looked at negatively and it could actually help [the petitioner's] case if you choose not to testify. Also, such an adverse inference, or a negative consequence, may be that [the petitioner] wins the trial if you choose not to testify." (Emphasis added.) Immediately thereafter the court asked the father whether he had any questions, and he stated, "no." The court also asked the father if he understood his rights. The father stated that he understood. At the end of the first day of evidence, the father's counsel, Diane Beltz-Jacobson, stated: "I believe my client may testify a short—a short testimony, Your Honor." On the second day of trial, the court asked Beltz-Jacobson whether she had witnesses to testify. Beltz-Jacobson stated: "I do not, Your

Honor."

On appeal, the father claims that at the time the court learned that he would not testify, it should have advised him that it "was going to [draw] an adverse inference for his failure to testify." The father claims that the notice given by the court at the start of trial merely informed him of the possibility that the court could draw an adverse inference, not a certainty that it would draw an adverse inference from his decision not to testify. The father, therefore, contends that the court failed to provide the notice required by Practice Book § 35a-7A and *In re Samantha C.*, supra, 268 Conn. 614. We are not persuaded.

The father's claim requires us to construe Practice Book § 35a-7A to determine whether the court failed to comply with the rule. "The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary. . . . In seeking to determine [the] meaning [of a statute or a rule of practice, we] . . . first . . . consider the text of the statute [or rule] itself and its relationship to other statutes [or rules]. . . . If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence . . . shall not be considered. . . . When [the provision] is not plain and unambiguous, we also look for interpretive guidance to the . . . history and circumstances surrounding its enactment, to the . . . policy it was designed to implement, and to its relationship to existing [provisions] and common law principles governing the same general subject matter. . . . We recognize that terms [used] are to be assigned their ordinary meaning, unless context dictates otherwise." (Citations omitted; internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 328 Conn. 586, 594, 181 A.3d 550 (2018).

Practice Book § 35a-7A provides: "If a party requests that the judicial authority draw an adverse inference from a parent's or guardian's failure to testify or the judicial authority intends to draw an adverse inference, either at the start of any trial or after the close of the petitioner's case-in-chief, the judicial authority shall notify the parents or guardian that an adverse inference *may be drawn* from their failure to testify." (Emphasis added.) Pursuant to the words of § 35a-7A and our review of the notice the court gave to the parties, the court did exactly what was required of it. The court advised the father at the start of the trial in the language of § 35a-7A, that is, that "an adverse inference may be drawn from [the parents'] failure to testify." The father does not contend otherwise; his contention is that he

was entitled to more than what § 35a-7A requires. He wanted the court to tell him that it intended to or that it would draw an adverse inference if he failed to testify. Section 35a-7A contains no language that requires the trial court to notify a parent that it will draw an adverse inference from the parent's failure to testify. The plain language of § 35a-7A notwithstanding, the father claims that the court's notice was inconsistent with *In re Samantha C.*, supra, 268 Conn. 614. We disagree.

*In re Samantha C.* concerned the termination of the respondent parents' parental rights as to their minor child. "The trial court found, by clear and convincing evidence, that the respondents had failed to achieve sufficient rehabilitation . . . and, accordingly, that court granted the [termination] petitions. In doing so . . . the trial court expressly drew an adverse inference against the respondents for their failure to testify at the termination proceeding . . . ." *In re Samantha C.*, supra, 268 Conn. 617. The principal issue in the appeal to our Supreme Court was "whether then existing [Practice Book (2001)] § 34-1 (f) allowed an adverse inference to be drawn against the respondents, without prior notice, for their failure to testify in a proceeding in which the petitioner sought to terminate their parental rights." (Footnote omitted.) Id., 616–17.

Our Supreme Court concluded that Practice Book (2001) § 34-1 (a), that required the judicial authority to "advise and explain to the parents their right to silence at the commencement of any [termination] proceeding, coupled with the trial court's repeated affirmation of that right throughout the various proceedings underlying this appeal, would have led a reasonable person to believe that such a right was, in fact, unqualified. Consequently, the [parents] were entitled to be notified by the court of the prospect that an adverse inference *might be drawn* from their silence. Put another way, if a trial court is inclined to draw an adverse inference against a parent for his or her failure to testify in a termination proceeding, it is incumbent upon the court to advise the parent accordingly." (Emphasis added; internal quotation marks omitted.) Id., 666. Our Supreme Court reasoned that Practice Book (2001) "§ 34-1 (a) strongly suggests that [it is] incumbent upon the trial court, not only to state expressly that parents have a right to silence, but also to explain, to some extent, the parameters of that right. The question then becomes precisely how much explanation was required in [*In re Samantha C.*]." Id., 667.

After reviewing the law regarding adverse inferences drawn from a party's failure to testify in noncriminal proceedings; id., 634–67; the court answered the "how much" explanation question, stating that "a central purpose behind chapter 34, especially [Practice Book (2001)] § 34-1 (a), was to enable parents in termination proceedings to make informed choices in structuring

their defense. With those principles in mind, we conclude that requiring the court to notify parents in the event that it may be inclined to draw an adverse inference is the most plausible procedural solution." Id., 673. Subsequently, Practice Book § 35a-7A was adopted and requires the judicial authority to "notify the parents or guardian that an adverse inference may be drawn from their failure to testify." The notice requirement of Practice Book § 35a-7A, therefore, is consistent with our Supreme Court's decision in *In re Samantha C.* In the present case, the court informed the father that the trial court may draw an adverse inference if he did not testify, which is in accord with Practice Book § 35a-7A.

In his appellate brief, the father states that the canvass the court gave at the start of trial was given pursuant to *In re Yasiel R.*, supra, 317 Conn. 773, and therefore was insufficient because it was not given pursuant to Practice Book § 35a-7A. This argument lacks merit, as it ignores the reasoning of *In re Yasiel R.*, which requires "a brief canvass of all parents immediately before a parental rights termination trial so as to ensure that the parents understand the trial process, their rights during the trial and the potential consequences." Id., 794. More importantly, however, is the fact that the canvass in *In re Yasiel R.* incorporates the notice required by § 35a-7A, i.e., "if the respondent does not intend to testify, he or she should also be advised that if requested by the petitioner, or the court is so inclined, the court may take an adverse inference from his or her failure to testify, and explain the significance of that inference." Id., 795.

Our review of the notice given by the trial court in the present case discloses that it was entirely consistent with the holding of our Supreme Court that the canvass "be given to all parents involved in a termination trial, not just those whose attorneys choose not to contest evidence. Indeed, we require that the canvass be performed at the very start of the termination trial, before a decision as to whether to challenge evidence has been communicated to the court. In so doing, the canvass we require does not single out those parents whose attorneys have made a tactical decision not to contest the evidence presented. As a result, the canvass we require does not interfere with the attorney-client relationship but serves to inform and protect *all* parents." (Emphasis in original.) Id., 794.

We find it of particular importance that our Supreme Court stated that the canvass was not to interfere with the attorney-client relationship. In the present case, the court advised the father of his rights before the start of evidence, at a time when the court was unaware of the evidence to come before it and, therefore, it was not in a position to determine whether it intended to draw an adverse inference if the father decided not to testify. At the end of the first day of trial, Beltz-Jacobson

informed the court that the father may give "short testimony." On the second day of trial, however, Beltz-Jacobson informed the court that she did not have any witnesses. By giving the canvass set forth in *In re Yasiel R.* in the presence of both the father and Beltz-Jacobson at the start of trial, the court provided the necessary information that the father and Beltz-Jacobson could use to plan their trial strategy, free from any suggestion that the court had a preference as to whether the father should testify.

It is without question that a parent may not be compelled to testify at a termination of parental rights trial and need not testify on his or her own behalf. See Practice Book § 32a-1; *In re Samantha C.*, supra, 268 Conn. 645. It also is without question that parents in a termination of parental rights proceeding are entitled to counsel. See Practice Book § 32a-1. Despite claiming that the court should have advised him that it intended to draw an adverse inference from his decision not to testify, the father argues that giving the notice required by Practice Book § 35a-7A at the start of trial may have a coercive effect on a parent's decision whether to testify. We disagree with the father's argument, as the notice provision of Practice Book § 35a-7A strikes a balance between a parent's right to remain silent and the risk that the trial court may draw an adverse inference from a parent's decision not to testify. Moreover, as our Supreme Court recognized, the purpose of former Practice Book (2001) § 34-1 (a) "was to enable parents in termination [of parental rights] proceedings to make informed choices in structuring their defense." *In re Samantha C.*, supra, 268 Conn. 673. Practice Book § 35a-7A has the same purpose. Whether a parent testifies at a termination of parental rights trial is a decision for the parent to make in consultation with his or her counsel without the coercive effect of the advisement for which the father argues. Practice Book § 35a-7A does not require a second notice; that rule itself provides notice to a parent that the court *may draw* an adverse inference from a parent's decision not to testify. Contrary to the father's argument, a notice provided at the start of the trial is the least coercive manner of advising a parent of his or her right to remain silent and the possible consequences of doing so. At the start of both the neglect proceeding and the termination trial, the father was advised of the possible consequences of his decision not to testify.

The father looks to General Statutes § 52-216c and *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), to support his position that the court was required to advise him that it *would* draw an adverse inference from his decision not to testify. Both the statute and *Malave* are inapplicable to a termination of parental rights trial. Section 52-216c and *Malave* concern jury instructions and final arguments of counsel permitted in civil and criminal cases, respectively. Section 52-216c

provides: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments, except where prohibited by section 52-174, that the jury should draw an adverse inference from another party's failure to call a witness who has been proven to be available to testify." Although a termination of parental rights proceeding is noncriminal in nature; *In re Samantha C.*, supra, 268 Conn. 673; such cases are tried to the court, not to a jury. Furthermore, a parent has an unquestionable right to remain silent in a termination of parental rights proceeding. There is no such right in a civil trial subject to § 52-216c. Thus, § 52-216c is inapplicable in a termination of parental rights trial, as the statute pertains to jury instructions and the right of counsel to argue to the finder of fact the absence of available witnesses who might have been expected to testify.

Section 52-216c and *Malave* have their historical roots in the missing witness rule. As a matter of policy, in *Malave*, our Supreme Court abandoned the missing witness rule of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), overruled in part by *State* v. *Malave*, 250 Conn. 722, 739, cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000),[12] in criminal cases. *State* v. *Malave*, supra, 250 Conn. 739. A brief review of the *Malave* decision illustrates why it is inapplicable to a termination of parental rights proceeding in which the trial court is the finder of fact.

In *Malave*, a 1999 decision, our Supreme Court examined the history of the missing witness rule and its associated jury instruction in civil and criminal cases. The court had "adopted the missing witness rule for civil cases more than seventy years ago . . . and expressly approved the rule for use in criminal cases nearly twenty-five years ago. . . . In 1998, however, the legislature prohibited the use of the missing witness instruction in civil cases; Public Acts 1998, No. 98-50 . . . ."[13] (Citations omitted.) Id., 729. The court set forth a number of policy reasons why the missing witness jury instruction was no longer appropriate in civil or criminal cases. Id., 730–38. The policy reason most relevant to the present case concerned jury instructions.[14] *Malave*, therefore, does not support the father's position because jury instructions are not relevant in termination of parental rights cases and counsel do not argue to a jury.[15]

In a termination of parental rights trial, the trial court is the arbiter of fact and is well aware of the witnesses and evidence presented by each of the parties. By giving the notice required by Practice Book § 35a-7A at the beginning of trial, the trial court puts the respondent

parent on notice that the court may draw an adverse inference if the parent does not testify. On the basis of that notice, the parent and his or her counsel can make a tactical decision regarding the evidence to present and whether the parent will testify. The notice informs a parent's trial strategy at the beginning of the case, not after the parent has presented his or her evidence, which is the time at which the court is able to draw an adverse inference, if at all.[16] Consequently, we conclude that the court properly informed the father of his right to remain silent and the possibility that the court may draw an adverse inference if he chose to do so. A second notice that the court intended to draw such an inference was not required.[17]

In response to the father's claim, the petitioner argues that, even if we were to conclude that the court was required to notify the father that it would be drawing an adverse inference from the father's failure to testify, which we do not, any error was harmless in light of the court's detailed findings of fact in its memorandum of decision and its articulation. The petitioner contends that the trial court's articulation dispels any notion that the court's drawing of an adverse inference from the father's decision not to testify was determinative of the court's decision to terminate the father's parental rights as to his sons. We agree with the petitioner.

The question to consider with respect to harmless error is whether the claimed erroneous act of the trial court likely affected the result of the trial. *State* v. *Ledbetter*, 41 Conn. App. 391, 399, 676 A.2d 409 (1996), aff'd, 240 Conn. 317, 692 A.2d 713 (1997). "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment." (Internal quotation marks omitted.) *In re Xavier H.*, 201 Conn. App. 81, 95, 240 A.3d 1087, cert. denied, 335 Conn. 981, 241 A.3d 705, and cert. denied, 335 Conn. 982, 241 A.3d 705 (2020).

We have reviewed the court's factually detailed memorandum of decision and its articulation. The court's articulation is in keeping with its memorandum of decision, which is replete with factual findings and details regarding the father, the efforts made by the department to reunify him with the boys, the father's failure to comply with the court-ordered steps, his unwillingness to benefit from services offered to him, and the type of parenting the boys need due to their special needs. The court articulated that the father failed to achieve the degree of rehabilitation which would encourage the belief that in a reasonable time he could assume a responsible position in the lives of his sons.[18] On appeal, the father does not challenge any of the court's factual findings. We, therefore, agree with the petitioner that

the notice given at the beginning of the termination trial was proper and that any impropriety was harmless.

## II

The father also claims that this court should exercise its supervisory authority to adopt an advisement for the trial court to affirmatively notify the father that it would be drawing an adverse inference upon his decision not to testify at trial. We decline the father's invitation to exercise our supervisory authority as the present case does not present the type of extraordinary circumstance for which the exercise of our supervisory power is intended. "Supervisory authority is an extraordinary remedy that should be used sparingly . . . . Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle . . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole . . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *In re D'Andre T.*, 201 Conn. App. 396, 407,     A.3d    , cert. denied, 336 Conn. 902,     A.3d     (2020). Practice Book § 35a-7A ensures the fair and just administration of the courts in termination of parental rights cases. Consequently, there is no basis for this intermediate appellate court to exercise its supervisory authority.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

*** January 13, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the boys' mother, who is not a party to this appeal. In this opinion, we refer to her as the mother. The mother testified at the termination of parental rights trial.

[2] Counsel for the boys has adopted the brief filed by the petitioner.

[3] The father was aided at trial by a Portuguese speaking interpreter.

[4] On September 24, 2019, before the presentation of evidence and in the presence of the father, the court stated:

"The Court: The court is mandated to provide the parties, the parents, immediately before trial with a canvass, an advisement, to insure that the parents understand the trial process, their rights during the trial, and any potential consequences. And this is what I will advise you of. If there is

anything you don't understand, please let me know and you can speak with your attorneys.

"Regarding the termination of parental rights trial that will be commencing after this advisement, the petitioner has previously filed with this court a legal document called a termination of parental rights petition, in which [the petitioner] seeks to have this court permanently end the legal parent-child relationship between you and Josiah and Jovani. Because [the petitioner] is the one who filed the . . . termination of parental rights petition, and is the one asking this court to permanently sever your legal relationship with your children, it is up to [the petitioner] to prove [the] case at a termination of parental rights trial, which is today by clear and convincing evidence.

"If [the petitioner] prevails or wins and the trial court grants the termination of parental rights petition, you will have no legal rights, no authority and no responsibility for your children. You will no longer have any right to make decisions of any kind regarding these children, Josiah and Jovani. You will not be entitled to any state or federal benefits or entitlements on behalf of the children and the children are free to be adopted only upon the termination of any of the parental rights.

"A termination of parental rights trial gives you, the parents, an opportunity to defend against the termination of parental rights petition. The termination of parental rights trial, at the trial anything you say or have said can and will be used against you. You have the right to remain silent and say nothing and do nothing which would help [the petitioner] prove [the] case. You have the right, if you choose, to tell the judge your side of the story and it's called testifying on your own behalf. You have the right to confront and cross-examine witnesses and/or evidence meaning the state will call their witnesses and you can challenge those witnesses. You can ask questions through your attorney of those witnesses to cause them to prove the truthfulness of the evidence that they're putting forth. And again, you can call witnesses on your own behalf and provide documents through your attorneys. . . .

"*As I just stated, your decision to testify or not testify at this termination of parental rights trial is yours to make. However, if you choose not to testify whether fully at the trial or any other partial hearing, the trial judge may draw an adverse inference, which means it could be held against you. It could be looked at negatively, and it could actually help [the petitioner's] case if you choose not to testify. Also, such an adverse inference, or a negative consequence, may be that [the petitioner] wins the trial if you choose not to testify.*

"If you do not present any witnesses on your own behalf or do not object to the testimony or exhibits, the documents that come in through the trial, or if you do not cross-examine, question the state's witnesses, [the petitioner's] witnesses, the court will decide the case based on the evidence that was presented at the trial. Do you have any questions? . . .

"The Court: And [Father], do you have any questions, sir?

"[The Father]: No.

"The Court: And do you understand the rights and everything I've just said? . . .

"The Court: [Father?]

"[The Father]: I understood." (Emphasis added.)

[5] In her brief on appeal, the petitioner represents that at the start of the neglect proceeding on May 10, 2018, Judge Ginocchio stated to the father: "No one could force you to testify at a trial such as this, however, if you don't testify, it could be held against you."

[6] The petitioner also filed petitions to terminate the parental rights of the mother.

[7] In adjudicating the petitions to terminate the mother's parental rights as to the boys, the court found, in part, that the mother had an extensive substance abuse history dating back to 2011. She has been diagnosed with opiate dependence, cocaine abuse, and alcohol abuse.

[8] The adjudication date is the date that the petitioner files a petition for termination of parental rights. See *In re Kylik A.*, 153 Conn. App. 584, 596, 102 A.3d 141, cert. denied, 315 Conn. 902, 104 A.3d 106 (2014).

[9] General Statutes § 17a-112 (k) provides in relevant part that, except in cases in which a parent consents to termination of his or her parental rights, "in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of

the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended . . . (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents . . . and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent . . . (B) the maintenance of regular contact or communication with the . . . custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[10] The petitioner asked the court to articulate the following five questions:"1. In stating the court takes an adverse inference with regard to [the] father . . . did the trial court mean that it was drawing an adverse inference against [the father] pursuant to *In re Samantha C.* on the basis that he did not testify at trial?

"2. If so, what weight did the court give the adverse inference, particularly as it relates to the evidence the [petitioner] presented at trial regarding [the father's] failure to regularly visit the [boys], failure to engage in recommended services . . . and failure to learn how to meet the [boys'] specialized needs? . . .

"3. With respect to the efforts element: If the court had not drawn an adverse inference, would it nonetheless have found by clear and convincing evidence that [the father] was unwilling to benefit from the department's reasonable reunification efforts, given that [the] father refused to cooperate with [the department] and did not consistently attend the visitations he was offered and failed to complete recommended services for parenting education and intimate partner violence? . . .

"4. With respect to the adjudicatory element: If the court had not drawn an adverse inference, would it nonetheless have found by clear and convincing evidence that [the father] had failed to rehabilitate, given that he failed to engage in the services offered to him, is unable to meet the developmental, emotional, educational, and moral needs of [the boys], and cannot and will not provide for the [boys'] safe shelter, nurturance, and security? . . .

"5. With respect to the best interests element: If the court had not drawn an adverse inference, would it nonetheless have found by clear and convincing evidence that termination of parental rights was in the best interests of the minor [boys], given the [boys'] respective ages, their specialized needs, the [father's] inability to meet those needs, and the [boys'] need for permanent loving homes?" (Citations omitted; internal quotation marks omitted.)

[11] As noted in footnote 5 of this opinion, Judge Ginocchio provided the notice required by Practice Book § 35a-7A to the father at the neglect proceeding.

[12] In *Secondino*, our Supreme Court stated that "[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." (Internal quotation marks omitted.) *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675. "[T]he jury charge explaining the rule commonly is referred to as the *Secondino* instruction or the missing witness instruction." *State* v. *Malave*, supra, 250 Conn. 724 n.2.

[13] The act was codified at § 52-216c. "The statement of purpose of the legislation abolishing the missing witness rule in civil cases was '[t]o overrule the decision of [our] Supreme Court in *Secondino* . . . and its progeny which results in longer trials with additional witnesses.' " (Emphasis omitted.) *State* v. *Malave*, supra, 250 Conn. 737 n.14; see footnote 12 of this opinion.

[14] The court was concerned about the influence a missing witness instruction may have on the jury. "[T]he risk that the jury will give undue weight to a witness' absence is further enhanced because, under the *Secondino* rule, the trial court expressly instructs the jury that it may draw an adverse

inference from the party's failure to call the witness. [T]here is a difference between what the jury might infer on its own, which can never be completely controlled, and what the jury might think when the absence of certain evidence is highlighted by . . . the judge's instructions." (Internal quotation marks omitted.) *State* v. *Malave*, supra, 250 Conn. 735.

[15] In abandoning the *Secondino* rule, our Supreme Court did "not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case." *State* v. *Malave*, supra, 250 Conn. 739. "Fairness, however, dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because comment on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure than an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case." Id., 740.

[16] In his brief, the father relies on dicta in *In re Jason B.*, 137 Conn. App. 408, 48 A.3d 676 (2012), that he has taken out of context. The father and the respondent in *In re Jason B.* both correctly noted that a trial court "must inform a respondent if it intends to draw an adverse inference from his or her decision not to testify." Id., 414. Immediately following that rule of law, this court stated: "See Practice Book § 35a-7A ('[i]f a party requests that the judicial authority draw an adverse inference from a parent's or guardian's failure to testify or the judicial authority intends to draw an adverse inference, either at the start of any trial or after the close of the petitioner's case-in-chief, the judicial authority shall notify the parents or guardian that an adverse inference may be drawn from their failure to testify')." Id., 414–15. The notice given by the court in the present case is consistent with the notice required, i.e., "an adverse inference may be drawn . . . ." Practice Book § 35a-7A. *In re Jason B.* does not support the father's contention on appeal.

[17] Requiring a second notice also is inadvisable for another more pragmatic reason. Judges presiding at a court side trial generally do not determine what evidence to credit or what inferences to draw until all the evidence has been presented. A judge typically reviews all of the evidence, frequently reading transcripts of the proceeding and/or reviewing his or her notes and carefully considers the legal and factual issues presented, as well as the practical ramifications of a decision and their effect on the litigants. Consequently, we expect that in most termination of parental rights cases, the judge is unlikely to be prepared to say, during the presentation of evidence, much less at the start of evidence, before the intense deliberative process commences, that he or she has decided to draw an adverse inference because a parent has decided not to testify. In the present case, the father is proposing a rule that would require a judge to opine prematurely on a matter of great importance. We are not prepared to create such a rule.

[18] The father contends that the court's failure to advise him that it would be drawing an adverse inference for his failure to testify was harmful, because had he known of the adverse inference, he would have offered noncumulative testimony. This argument comes a bit late. The father did not file a motion to open the judgment or for reconsideration. The father has not provided a proffer of what his testimony might have been nor has he explained why he did not voluntarily offer it at trial, and how it would have affected any of the court's factual findings.

---